# IN THE COURT OF APPEALS OF IOWA

———————————

No. 24-1930
Filed February 25, 2026

———————————

**In re the Marriage of Adam R. Melcher and Lyndsey C. Melcher**

Upon the Petition of
**Adam R. Melcher,**
Petitioner–Appellant/Cross-Appellee,

And Concerning
**Lyndsey C. Melcher,**
Respondent–Appellee/Cross-Appellant.

———————————

Appeal from the Iowa District Court for Jefferson County,
The Honorable Shawn R. Showers, Judge.

———————————

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
WITH DIRECTIONS**

———————————

Abigail L. Brown of Leff Law Firm, L.L.P., Iowa City, attorney for
appellant.

Diana L. Miller and Sydnee M. Waggoner of Whitfield & Eddy, P.L.C.,
Mount Pleasant and Des Moines, attorneys for appellee.

———————————

Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.
Opinion by Buller, J.

1

**BULLER, Judge.**

Adam Melcher appeals, and Lyndsey Melcher cross-appeals, from a modification proceeding following the dissolution of their marriage. They raise a variety of claims about physical care, the visitation schedule, Adam's income for purposes of child support, trial-attorney fees, fees owed to the child and family reporter (CFR), and appellate-attorney fees. We affirm the custodial provisions but reverse and remand for further proceedings related to Adam's income for purposes of child support and the CFR fees.

## BACKGROUND FACTS AND PROCEEDINGS

Adam and Lyndsey divorced in 2021 by stipulation. They share three children born in 2010, 2013, and 2021. The stipulated decree established joint legal custody and shared physical care for the two oldest children, while Lyndsey had physical care of the youngest (who was a newborn at the time of divorce).

As of trial, Adam was thirty-seven and lived with his girlfriend and her children in Fairfield. He works for his parents' automotive repair business, is an EMT and firefighter, and owns several rental properties. The court set his annual gross income for child support purposes at $100,000 after it attributed no income for Adam's multiple rental properties.

Lyndsey was thirty-nine as of trial and lived in Libertyville. She works for an investment company, and the court determined her income to be $77,000 per year.

According to Lyndsey, she and Adam "got along" and co-parented reasonably well right after the divorce. And their public-facing interactions at the children's sporting and school events showed them supporting the children as a team. But as time has passed, Adam's communication with and

about Lyndsey has worsened significantly. For example, during a custody exchange with the children nearby, he called her a "fucking cunt" and told her "I hope you get cancer, you fucking bitch." In a particularly concerning recording, Adam and his girlfriend discussed murdering Lyndsey in such detail that he mentioned wearing booties over his shoes and observed that using a gun would be messy—a conversation that, at trial, a deputy sheriff described as "disturbing." The two also discussed their hope Lyndsey would get a boyfriend so they could "Romeo and Juliet[1] the shit out of that deal. She does him then she does herself." And Adam said he was "stronger" than Lyndsey, so he "could probably make it look like she killed herself." Adam also told the children's daycare provider that Lyndsey is a "psycho" and "bad mother." And he told law enforcement she was a "bitch." At trial, Adam begrudgingly admitted to calling Lyndsey and her attorneys "a dumb bunch of cunts"—though he waffled on taking responsibility even after being confronted with his own recording of the comment.

According to Lyndsey, all of this strife and negative communication negatively affected the children—in particular the older children's academics and mental health, and the youngest child's toilet training. Lyndsey believed, and other evidence confirmed, that Adam was putting the children in the middle of their parenting disputes. For her part, Lyndsey testified that she tried to "never talk poorly about Adam in front of the children" and tried to be supportive of him spending time with the children whenever possible.

Adam surreptitiously created more than 700 audio or video recordings of his interactions with Lyndsey (sometimes including the children and their

---

[1] Spoiler alert: by the end of the play, both Romeo and Juliet are dead. *See* William Shakespeare, *Romeo and Juliet*, act 5, sc. 3.

sporting events), which the district court found was a "red flag."[2] Adam claimed the recordings were evidence of Lyndsey "changing the story and misrepresenting what had happened," but he later admitted the recordings did not support that claim. And he did not offer into evidence any recordings demonstrating bad behavior by Lyndsey. Lyndsey testified that Adam drove by her house so frequently she felt like she was "being watched." At trial, Adam denied stalking Lyndsey, but the district court wrote it specifically "d[id] not believe this testimony." Some of the other recordings include statements Adam made to the children, where he can be heard manipulating them or calling Lyndsey names. Adam testified that he wished he could get along better with Lyndsey and that he regretted some of the worst things he said. But he also described the recorded conversations—including the one about murdering Lyndsey—as "talking and venting and doing the things that most normal adults do."

In addition to the interpersonal conflict with Lyndsey, Adam has also created other parenting problems. He has refused to pay for necessary allergy testing to address one of the children's allergies to most common antibiotics. And he refused to participate in multiple sessions with one of the children's counselors, even though the counselor concluded meeting with Adam and Lyndsey separately for multiple sessions was necessary for the counselor to make any progress with the child. Adam refused to introduce Lyndsey to his girlfriend, even though she has lived with the children for more than a year

---

[2] Adam also recorded some of his interactions with people other than Lyndsey, and some were admitted as evidence at trial. We do not dwell on these, except to note they generally support the district court's ruling. For example, Adam recorded himself disparaging Lyndsey to a stranger—a prospective tenant—and claimed he "gave up" physical care of the youngest child to get more time with his "big kids." He also recorded interactions with the children in which he undermined Lyndsey's parenting and told them they could soon choose to live with him most of the time.

and helps take care of them during Adam's parenting time. Adam also repeatedly failed to pay one of the children's daycare providers on time, forcing Lyndsey to cover Adam's share so that the provider did not disenroll the child. Adam threatened criminal kidnapping charges against the same daycare provider when she asked him to not drop in unannounced and to follow the custody agreement for picking up the child; Adam made her so uncomfortable that she expressed concern to the local police chief. Before trial, the court enjoined Adam from being on the daycare provider's property. Even with the injunction, the daycare provider testified at trial that she feared reprisal from Adam.

For his part, Adam blamed Lyndsey for not allowing him more parenting time with the youngest child after the child finished breastfeeding. He also faulted Lyndsey for subpoenaing his financial records, which he claimed was a "dig at financial control." And he blamed the daycare provider for asking questions, though he admitted to eventually agreeing to the injunction.

A common theme among trial witnesses was that there was a "Jekyll and Hyde"[3] dynamic at play, especially with Adam's behavior. One of Lyndsey's friends, who had witnessed ten-to-twenty custody exchanges, testified that Adam yelled at Lyndsey during about half of the exchanges. The district court credited this testimony, including that "Adam called Lyndsey names while the kids were present." This same friend observed that, when members of the public were around, Adam would behave differently, like everything was fine between him and Lyndsey—he would even touch

---

[3] A second classical-literature spoiler: Mr. Hyde is the murderous alter-ego of the gentlemanly Dr. Jekyll. *See generally* Robert Louis Stevenson, *The Strange Case of Dr. Jekyll and Mr. Hyde* (London, Longmans, Green & Co. 1886).

Lyndsey and put his arm on her back. Lyndsey testified that this behavior led "people at soccer practice [to] still think we're married," even though she had "asked [Adam] numerous times not to touch [her]." In a similar example of presenting differently to different parties, Adam professed at trial that he supported the children attending counseling throughout the relevant periods of time, yet the CFR cast doubt on this claim, concluding that Adam had "made some sort of communication to the school that he didn't agree with the counseling and then tried to walk it back." Last, among its credibility findings, the district court observed that Adam simultaneously appeared "irritated" and "gregarious and mostly friendly."

One of Lyndsey's coworkers, who knows both parents from soccer practices, testified that Adam and Lyndsey were both good parents who love their kids. The court found this witness was Adam's "best," as she testified that Adam and Lyndsey could at least occasionally co-parent successfully.

Lyndsey told the court that she had to take out loans on her home and retirement account, as well as borrow from her parents, to pay attorney fees for the modification action. A significant amount of Lyndsey's legal expenses related to dealing with the hundreds of recordings Adam created. And additional costs were incurred by depositions because, in Lyndsey's words, Adam's parents were "trying to hide the fringe benefits that they provide for Adam" through the family business. Lyndsey and her parents also fronted some of the fees for the court-appointed CFR. According to Lyndsey, both Adam and his family told her she would "financially be destroyed" if she sought court intervention regarding the children.

The CFR reported that the parenting dynamic had affected the children. She observed that both parents loved the children, but they had different parenting styles: Lyndsey is the more organized caregiver, while

Adam "has a more joking style of personality that perhaps maybe doesn't mesh well with Lyndsey's style of personality." The CFR thought Lyndsey had generally been more proactive about providing for the children's medical and mental-health needs. And she testified that the children overhearing the disputes and disagreements between their parents was not in their best interests. She described Adam's habit of recording every interaction with Lyndsey a "terrible idea," particularly to the extent it put the children in the middle at events like custody exchanges. And she testified that there was consensus among people she talked to that at least one of the children had struggled with mental health over the last few years.

The court's ruling concisely summed things up: "Adam and Lyndsey do not like each other." The court found their animosity infected their relationships with the children and negatively affected the family unit. And the court expressly noted that, while not all blame for this was equal, both parties contributed to the deterioration in their ability to co-parent. In much the same vein, the court also credited the CFR report, which noted that Adam and Lyndsey both loved their children but had lost sight of the children's best interests due to their dislike of each other.

Despite some less-than-ideal behavior by both parties, the district court opined that "[t]he modification decision is not a close call." Although the court noted Lyndsey was somewhat preoccupied with money and control, it found this was far outweighed by Adam's "volatile behavior and disrespectful communication." And the court found the degree of conflict between Adam and Lyndsey was "extraordinarily high."

The court ultimately found a substantial change in circumstances and that Lyndsey was the superior parent, resulting in the court placing physical care of all three children with Lyndsey. But the court also increased Adam's

parenting time with the youngest child, at least partially consistent with both parties' stated preference for all three children sharing a similar schedule. The court also ordered Adam to pay $15,000 of Lyndsey's trial-attorney fees and the outstanding CFR fees, based on his higher earning potential and his "stubbornness regarding discovery."

Lyndsey moved to enlarge or amend. As relevant to this appeal, she sought to assign all of the CFR fees to Adam. Adam also moved to enlarge or amend. As relevant to this appeal, he sought to further increase his time with the children, make a related change to the child-support calculation, and decrease the award of attorney fees. The court acknowledged Lyndsey's request on the CFR fees but then assigned the same portion of fees to Adam. The court increased Adam's parenting time to include a weekday overnight but denied his request to decrease the award of attorney fees. Adam appeals, and Lyndsey cross-appeals.

## STANDARD OF REVIEW

"Petitions to modify the physical care provisions of a divorce decree lie in equity. [And] our review is de novo." *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015) (internal citation omitted). We give weight to the district court's factual findings, particularly regarding the credibility of witnesses, but we are not bound by them. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). "The children's best interest is the controlling consideration," providing "the flexibility necessary to consider unique custody issues on a case-by-case basis." *Hoffman*, 867 N.W.2d at 32 (cleaned up).

# DISCUSSION

Adam argues in his appeal that the district court should not have placed physical care of the two older children with Lyndsey because he believes there was not a material and substantial change in circumstances and, even if there was, Lyndsey is not the superior parent. He also argues that the court should have only modified physical care of the youngest child to be equally shared or, in the alternative, he should have more visitation. And he challenges the court's order that he pay Lyndsey's trial-attorney fees and the remaining fees for the CFR. He also urges that, should he prevail on appeal, he should receive appellate attorney fees. Lyndsey resists all of Adam's arguments. She also claims on cross-appeal that the district court erred in altering the visitation schedule, erred in calculating Adam's income for purposes of child support, and erred in dividing the CFR fees. She also asks for appellate attorney fees. Given the laundry list of issues pressed by the parties and the sometimes-overlapping claims, we address the substance in a slightly different order than the parties' briefs.

## I.    Substantial Change in Circumstances

Adam first contests whether there was a substantial change in circumstances. The legal standard is well established:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. A parent seeking to take custody from the other must prove an ability to minister more effectively to the children's well being. The heavy burden upon a party seeking to modify custody stems

9

> from the principle that once custody of children has been fixed it should be disturbed only for the most cogent reasons.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

On review, we agree with the district court that the conflict between Adam and Lyndsey is worse now than it was at the time of the divorce. This is well corroborated by the record, including the CFR's report and the numerous audio-video and text-message exhibits that show first-hand the deterioration in the parties' interactions. Beyond the communication issues, there is also record evidence detailing the problems with daycare, exchanges, and payment for the children's expenses. These changes in circumstance relate directly to the welfare of the children, given the testimony establishing how the conflict between parents affected the children in different ways—whether with academics, their emotional health, or their toilet training. This is the type of persistent parenting discord our courts have previously recognized as a proper basis for modification. *See, e.g.*, *In re Marriage of Harris*, 877 N.W.2d 434, 442–44 (Iowa 2016); *In re Marriage of Walton,* 577 N.W.2d 869, 870 (Iowa Ct. App. 1998).

The gist of Adam's argument on appeal is an attempt to re-litigate his bad behavior as found by the district court, essentially incident by incident. But even de novo appeals are not the trial redux. *See Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024). Suffice to say, we have considered Adam's attempts at minimizing or justifying his behavior, and—like the district court—we are not persuaded. We also affirmatively reject Adam's contention that his discussions with his new paramour about killing Lyndsey reflect the ordinary acrimony of divorce; most people don't discuss in detail their plans for killing an ex-spouse, let alone openly wish for their homicide or suicide (on a recording of their own making, no less). In short, the discord between these

parties is beyond the norm, and Adam downplaying his conduct on appeal is no basis for relief.

We single out one aspect of the district court's ruling for more discussion only because Adam does so in his appellate brief. According to Adam, the "district court took an unusual interest" in the fact his live-in girlfriend remained married to another man. But as we read the district court ruling, it seems the court mentioned this fact due to the perceived hypocrisy of Adam criticizing others and holding himself out as a man of faith and positive role model. To this appellate panel, Adam's girlfriend's marital status has no probative value in assessing whether there has been a material and substantial change in circumstances since the divorce.[4] But we share the court's underlying concerned that Adam is acting hypocritically—to put it mildly—when he purports to be a role model for his sons while also calling Lyndsey the four-letter words set forth in this opinion, hoping for her suicide, and fantasizing about her murder. To the extent the district court's comment on Adam's hypocrisy for living with a woman married to another man was inartful or unnecessary, it did not prejudice Adam, and any error was harmless given our de novo review. And to the extent Adam urges on appeal he is owed relief because the district court was biased or engaged in unethical conduct, we disagree.

## II.    Physical-Care Placement

Neither Adam nor Lyndsey, in the absence of the acrimony between them, are bad parents. Both love their children and want what's best for

---

[4] We recognize there is record evidence that Adam's girlfriend's children—who live at Adam's house—receive preferential treatment compared to Adam's children, which is a source of strife. This could weigh in favor of changed circumstances. But we don't need to wade into that messy issue to resolve this appeal, so we don't.

them. And the primary dispute below was Adam seeking shared physical care of the youngest child, while Lyndsey sought physical care of the older two—in other words, each sought to have all three children on the same schedule with differing opinions of what that schedule should be. But their excessive discord and dysfunction have proven shared physical care unworkable. Considering the *Hansen* factors, the district court found the parents "do not come close" to satisfying two factors crucial to such an arrangement: respectful communication and a low degree of conflict. *See Hansen*, 733 N.W.2d at 698–99. The court also found "Lyndsey presented a compelling case" as to the children's best interests overall. The remaining *Hansen* factor—historical contribution to physical care—weighed in favor of shared physical care, but it did not outweigh the other factors in this analysis. *See id.* at 698. Considering Adam's behaviors and Lyndsey's responses, as well as their differing approaches to home life, school priorities, and emotional challenges, we agree with the district court that shared physical care is no longer appropriate for this family. As for Adam's arguments specific to switching the youngest child to shared physical care, we reject this claim for the same reasons discussed regarding the older children.

Once shared physical care was no longer in the children's best interests, the district court had to determine which parent would be the superior caregiver for physical-care placement. *Frederici*, 338 N.W.2d at 158. Our controlling consideration is which placement would be in the children's best interests. *Hoffman*, 867 N.W.2d at 32. We look at the factors from Iowa Code section 598.41 (2023) "to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695–96 (applying section 598.41 custody factors to a physical-care decision).

On our review, we agree with the district court that Lyndsey is best able to minister to the children's needs. Although Adam is a major presence in the children's lives, the record makes clear that Lyndsey has the lion's share of responsibilities for the children's day-to-day mental, physical, financial, and emotional needs. The greatest disparity between these parents is in their ability to treat the other with respect, such that it will foster the children's relationship with both parents—not just one. On this item, the scales tip decisively in favor of Lyndsey: given the language Adam uses to interact with Lyndsey and talk about her with third parties, some of which has been deployed in front of the children, it is hard to imagine Adam fostering the children's relationship with their mother in any positive way. And we note here our explicit conclusion that it is not just the vulgar and threatening language used by Adam that matters, but also the underlying animosity and disrespect—if not outright hatred—it communicates to all listeners about how this father feels about the children's mother. Healthy communication between divorced parents is a necessary ingredient for successful co-parenting, and Adam has proven again and again that he is unable to communicate in a civilized manner. We affirm placing physical care of the children with Lyndsey.

## III.   The Children's Preferences

Adam also argues the district court erred by not adequately considering the older children's wishes. *See* Iowa Code § 598.41(3)(f). We assume Adam does not contend the three-year-old's wishes could be readily ascertained. And neither of the older children testified at trial, so the only information we have about their preferences is from the CFR. Her report includes paraphrases of her discussion with them: one child expressed that he might like to spend more time at Adam's house, though the CFR

speculated that may be in part because Adam does not limit that child's time playing a popular online videogame in his room and Lyndsey does; the other child generally expressed that he would like things to stay the same, though the CFR noted that was consistent with this child's overall dislike of changes or disruptions and that he was emotional yet generally hesitant to share his feelings with her. The district court acknowledged these preferences, though it found other interests outweighed the children's preferences and warranted modification.

We reject Adam's contention the district court had "casual disregard" for the children's preferences. Although we shouldn't have to say it, we observe that attacking the district court's motives is generally unhelpful to appellate review. And here, Adam mischaracterizes the ruling. The district court specifically acknowledged the children's preferences and placed them in an appropriate context—including concerns about their grades and mental and emotional wellbeing. We discern no error. And on our de novo review, we agree with the district court's overall conclusion. So we reject Adam's inaccurate claims on this issue.

## IV. Weekday Overnights for Adam

Lyndsey urges the court erred in awarding Adam the mid-week overnight with the children. We tend to agree with Lyndsey that the post-trial ruling is sparse on details of why the court ordered an additional overnight with Adam during the week. But given the length of the original decree and the state of the record, there is enough information before us we are comfortable performing appellate review.

As noted throughout this opinion, we believe the district court was in the best position to decide the important credibility questions in this case and determine the children's best interests. On that basis, and because we

14

generally agree that spending significant time with Adam is important to the children's development and growth, we affirm. We recognize Lyndsey speculates that this change will disrupt the children's routine and negatively affect their mental health and academics. But this claim is undercut by the fact Lyndsey herself proposed a weekday overnight for Adam. And we recognize that the frequent nature of the children's after-school activities would often fill a substantial portion of a shorter weekday parenting time. Should the weekday overnight prove to be truly disruptive in a way the district court could not have foreseen, Lyndsey may petition again for modification—though we express no preemptive opinion on the merits of such a petition. At this juncture, we have no cogent basis that would justify disturbing the new visitation schedule.

## V. Adam's Income

Lyndsey next argues the district court undervalued Adam's income with its figure of $100,000. Specifically, she points to record evidence establishing Adam makes roughly $106,000 per year from his automotive job, another roughly $6,000 from his work as an EMT and firefighter, and some amount of income from rental properties (seemingly in a gross amount as high as $35,400). She also emphasizes that Adam listed his own income as $135,400 in a sworn financial statement he provided a bank. Record developed at trial indicates Adam failed to disclose the rental venture during earlier stages of litigation. And Adam claimed at trial that he lied or misrepresented his income to the bank on the financial statement.

We largely agree with Lyndsey's position. The district court underestimated Adam's income by at least approximately $12,000, even without counting the rental income. This record does not give us all of the satisfactory answers about how much of the $35,400 gross rental income

should be considered net income for child-support purposes, in the sense that we don't know Adam's expenses and cannot make a conclusion about whether they are properly considered as reducing his income for purposes of the child-support calculation. And we are not inclined to blame Lyndsey for this deficit in the record, as she put forward competent proof of Adam's gross income.

Based on this peculiar record, we vacate the district court's child-support calculation and remand with directions to calculate Adam's income for purposes of child support based on his full wages at the automotive job, his full wages from working as an EMT and firefighter, and his net rental income. *See In re Marriage of McCabe*, No. 20-1121, 2022 WL 468738, at *5 (Iowa Ct. App. Feb. 16, 2022) (including income from rental properties as part of the calculation of actual income for determining child support). If Adam does not supply adequate information for the district court to determine his net rather than gross income from rental properties, the court shall impute the full gross rental income to Adam for purposes of child support.

## VI. CFR Fees

Lyndsey argues that, since she prevailed below and Adam was ordered to pay court costs, he should bear the full cost of the CFR. We agree. *See* Iowa Code § 598.12B(3) ("The court shall enter an order in favor of the . . . child and family reporter for fees and disbursements, and the amount shall be charged against the party responsible for court costs . . . ."); *In re Marriage of Drury*, No. 22-0494, 2023 WL 152519, at *6 (Iowa Ct. App. Jan. 11, 2023) (concluding the district court lacks discretion to divide CFR fees in light of the clear statutory language of section 598.12B(3)). But the exact state of who was ordered to pay what in regard to the CFR fees is a little murky at this

point in the litigation. Lyndsey advanced at least $10,500 in CFR fees before trial, and it appears the district court only ordered Adam to pay the remaining outstanding fees in the amount of approximately $4,327. Pursuant to section 598.12B(3), Adam is responsible for the full amount. We therefore reverse any contrary portion of the district court's ruling and remand with directions for the district court to order Adam to pay the full cost of the CFR, including reimbursing Lyndsey for fees she advanced.

## VII. Attorney Fees

Adam asks that, if he prevails on appeal, we reverse the district court's award of attorney fees to Lyndsey. He also asks us to award him appellate attorney fees. Because he did not prevail on any of his appellate issues and his income is substantially greater than Lyndsey's, we reject both his claims outright. *See* Iowa Code § 598.36; *In re Marriage of Kisting*, 6 N.W.3d 326, 337–38 (Iowa Ct. App. 2024).

Lyndsey also requests appellate attorney fees, asking us to award her $10,000 in fees based on Adam's income and substantial assets. Because Lyndsey was required to defend the district court's judgment from Adam's appeal, because she prevailed in part on her own cross-appeal, and because we agree Adam has substantially greater income and assets, we conclude Adam should pay no more than 75% of Lyndsey's appellate-attorney fees. Lyndsey submitted a fee affidavit detailing more than $20,000 in appellate-attorney fees. We have reviewed the affidavit and conclude that, even applying a 25% reduction, there is more than adequate billing to support her $10,000 request. We order Adam to reimburse Lyndsey for $10,000 in appellate-attorney fees.

## DISPOSITION

We affirm the district court ruling in all aspects but two: we reverse the child-support calculation for further proceedings and remand for a new calculation of Adam's income, and we reverse and remand with directions for the district court to order Adam to pay all CFR fees and vacate any language to the contrary in the district court's order. We also order Adam to reimburse Lyndsey $10,000 in appellate-attorney fees. Costs on appeal are assessed 75% to Adam and 25% to Lyndsey.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**